Argued and submitted on January 25; on petitioner-respondent Springfield Utility Board's motion to take judicial notice filed December 24, 2020, and petitioner-respondent Royal Blue Organics' response to the motion to take judicial notice filed January 7, Springfield Utility Board's motion to take judicial notice allowed in part, denied in part; LUBA order reversed and remanded on Springfield Utility Board's petition, affirmed on Royal Blue Organics' petition April 7, 2021

ROYAL BLUE ORGANICS,
*Respondent,*

*v.*

CITY OF SPRINGFIELD,
*Respondent,*

*and*

SPRINGFIELD UTILITY BOARD,
*Petitioner.*

ROYAL BLUE ORGANICS,
*Petitioner,*

*v.*

CITY OF SPRINGFIELD
and Springfield Utility Board,
*Respondents.*

Land Use Board of Appeals
2019092, 2019094, 2019095, 2019134;
A175041

487 P3d 440

The City of Springfield and Lane County conditionally approved Springfield Utility Board's (SUB) applications to construct an electrical substation and power lines in the community of Glenwood. Royal Blue Organics (RBO) challenged that conditional approval. It argued, among other things, that (1) the geotechnical reports submitted by SUB in connection with its hillside development permit application did not conform to the applicable local standards and (2) SUB was precluded from building its substation on the proposed site because it contained a wetland protected from development by the Springfield Development Code (SDC). The local authorities rejected RBO's arguments and RBO then appealed to the Land Use Board of Appeals (LUBA). LUBA rejected RBO's argument that the geotechnical reports were deficient but agreed that the wetland on SUB's proposed site restricted development of the substation. Specifically, LUBA concluded that the site contained a "watercourse" subject to protection under SDC 4.3-115, and that remand was necessary to determine whether development would be prohibited altogether. SUB and RBO each seek judicial review of LUBA's final order. Additionally, SUB requests that the Court of Appeals take judicial notice of several documents related to the project and the local development standards. *Held*: First, the Court of Appeals agreed to take judicial notice of some, but not

all, of SUB's proffered documents. On the merits of the parties' arguments, the court concluded that (1) LUBA did not err in determining that SUB's geotechnical reports were sufficient to support hillside development under the applicable ordinances and (2) LUBA erred in concluding that the wetland on SUB's proposed site was subject to the prohibitions listed in SDC 4.3-115. The plain text and context of the applicable ordinances demonstrate that SUB could develop the site so long as it complied with state and federal wetland permitting requirements. Because it had done so, the city correctly approved SUB's application.

Springfield Utility Board's motion to take judicial notice allowed in part, denied in part. LUBA order reversed and remanded on Springfield Utility Board's petition; affirmed on Royal Blue Organics' petition.

Zack Mittge argued the cause for petitioner-respondent Royal Blue Organics. On the opening brief for petitioner were William H. Sherlock, Jonathan Hood, and Hutchinson Cox. On the answering brief for respondent were William H. Sherlock, Zack Mittge, and Hutchinson Cox.

Michael J. Gelardi argued the cause for petitioner-respondent Springfield Utility Board. Also on the briefs was Gelardi Law P.C.

No appearance for respondent City of Springfield.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Springfield Utility Board's motion to take judicial notice allowed in part, denied in part. LUBA order reversed and remanded on Springfield Utility Board's petition; affirmed on Royal Blue Organics' petition.

**MOONEY, J.**

The City of Springfield (city) approved the Springfield Utility Board's (SUB) applications for site plan review, tree felling, and hillside development permits for a new electrical substation and related power lines in the unincorporated community of Glenwood, in Lane County. Royal Blue Organics (RBO) appealed those decisions to the local planning commission and hearings official, who jointly affirmed the city's approvals. RBO filed an appeal with the Land Use Board of Appeals (LUBA) and LUBA, in turn, remanded all three decisions for further consideration of limited issues. RBO and SUB each seek judicial review of certain aspects of LUBA's final order. In its sole assignment of error, SUB seeks reversal of LUBA's determination that the substation site is a "watercourse" subject to protection under Springfield Development Code (SDC) 4.3-115. In its sole assignment of error, RBO seeks reversal of LUBA's determination that the geotechnical reports submitted by SUB in connection with its hillside development permit application conformed to the applicable local standards. We reverse on SUB's petition and we affirm on RBO's petition.

## SUB'S MOTION TO TAKE JUDICIAL NOTICE

We begin by resolving SUB's motion to take judicial notice of certain laws, plans, and facts in order to clarify the record on review. SUB filed a motion requesting that we take judicial notice of several categories of documents that are not in the record, to which RBO filed a memorandum in opposition. We deferred ruling on the motion and turn to it now, beginning with general principles of jurisdiction and the record before us for review.

Jurisdiction for judicial review of LUBA orders resides exclusively with the Court of Appeals. ORS 197.850(2) and (3). The "entire record of the proceeding under review" is that which is transmitted to us by LUBA. ORS 197.850(5). Our review is confined to that record and "we may not substitute [our] judgment for that of the board as to any issue of fact." ORS 197.850(8). ORAP 4.67 requires the petitioner to include "copies of all provisions of local government documents (*e.g.*, ordinances, plans) * * * pertinent to its

arguments on judicial review in the excerpt of record if the provisions are part of the record or in an appendix *** if the provisions are not part of the record." The purpose of the appendix is to provide "materials that would be helpful in understanding and resolving an issue raised on appeal," but it should not include "materials from the record of the tribunal from which the appeal is taken that should be in the excerpt of record." ORAP 5.52. With these principles and rules in mind, we turn to the specific documents that SUB requests we judicially notice.

OEC 202(7) provides for taking judicial notice of city and county ordinances and comprehensive plans.[1] In accordance with that provision, we take judicial notice of the following ordinances:

i.   Springfield Development Code (SDC) sections 4.3-110, 4.3-115, 4.3-117, 5.17-125, and 6.1-110. SUB's Opening Brief, Appendix 1-27.

ii.  Ordinance No. 6021, including Water Quality Limited Watercourse Map. SUB's Opening Brief, Appendix 28-73.

iii. Ordinance 6265 (2011). Appendix 139-140.

We decline to take judicial notice of the following documents, because they are neither city nor county ordinances or plans:

i.   Glenwood Local Wetland Inventory Report (2010).

ii.  Springfield Natural Resource Study Report, October 2005 (updated 2011).

OEC 202(2)[2] provides for taking judicial notice of official acts of the state and federal governments, and OEC

---

[1] OEC 202 provides, in part:

"'Law judicially noticed' is defined as:

"*****

"(7) An ordinance, comprehensive plan or enactment of any county or incorporated city in this state, or a right derived therefrom."

[2] OEC 202 provides, in part:

"Law judicially noticed is defined as:

"*****

201(b)[3] permits judicial notice of facts not subject to reasonable dispute that are capable of accurate and ready determination. We take judicial notice of the fact that Army Corps Permit No. NWP-2018-610 (2020) and Oregon Department of State Lands (ODSL) Removal-Fill Permit No. 61795-RF (2020) were issued by each respective agency. *See McGee Plumbing, Inc. v. Building Codes Div.*, 221 Or App 123, 131, 188 P3d 420 (2008) ("An agency decision is an official act within the scope of [OEC 202(2)]."). Except as to the fact of permit issuance itself, we decline to take judicial notice of the associated "permit documents."

We likewise decline to take judicial notice of SUB's city code interpretation application (Appendix 473-483) and the city planning director's response (Appendix 484). Neither the application nor the response are official acts noticeable under OEC 202(2).

## BACKGROUND

The pertinent facts and procedural background are taken from LUBA's final order and from undisputed evidence in the record. Glenwood is situated alongside the Willamette River between the City of Springfield on the east and the City of Eugene on the west. Glenwood is partly within Springfield city limits, partly within unincorporated Lane County, and entirely within the Springfield urban growth boundary (UGB). Its development has been discussed and studied extensively since at least 1982, when the Eugene-Springfield Metro Plan (Metro Plan) established a process to urbanize Glenwood. In 2014, the Glenwood Refinement Plan (Glenwood Plan) was adopted to govern the development of Glenwood's riverfront. It requires SUB to provide electric

---

"(2) Public and private official acts of the legislative, executive and judicial departments of this state, the United States, any federally recognized American Indian tribal government and any other state, territory or other jurisdiction of the United States."

[3] OEC 201(b) provides:

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either:

"(1) Generally known within the territorial jurisdiction of the trial court; or

"(2) Capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

service to Glenwood and to work with the city to evaluate sites for the installation of a new electrical substation and transmission lines to facilitate Glenwood's mixed-use urbanization. In 2015, the Eugene-Springfield Metropolitan Area Public Facilities and Services Plan (PFSP) was amended to reflect general locations for the substation and power lines.

In 2019, SUB applied for a federal wetland fill permit and for associated Oregon DEQ water quality certification for the substation site. Both were granted. SUB also applied for and received city approval of the substation and power line project from the city planning director. RBO appealed the director's decisions concerning the substation site to the Springfield planning commission,[4] and it appealed the director's decisions concerning the tree felling and hillside development permits to the Springfield hearings official.[5] The planning commission and the hearings official conducted joint hearings and affirmed the site plan approval, hillside development permit, and tree felling permit with some conditions attached. RBO appealed those decisions to LUBA. While the LUBA appeals were pending, the city planning director issued an interpretation related to the site plan approval. RBO filed an appeal of that interpretation as well. LUBA consolidated the four appeals and issued its Final Opinion & Order in LUBA Nos. 2019-092/094/095/134 on November 12, 2020. LUBA rejected some assignments of error, sustained others, and remanded for further proceedings at the local level.

The questions on appeal have been narrowed considerably, with RBO and SUB each raising a single assignment of error in their respective petitions.

## STANDARD OF REVIEW

Our task is to determine whether LUBA's order is "unlawful in substance or procedure[.]" ORS 197.850(9)(a).

---

[4] The planning commission has jurisdiction over the substation site, tax lot 101, and a portion of tax lot 1100, because that property is located within Springfield city limits.

[5] The hearings official has jurisdiction over the site for utility poles and transmission lines, because the property in question, tax lots 300, 1000, and a portion of 1100, is located outside city limits but within the urban growth boundary.

RBO'S PETITION

RBO seeks reversal of LUBA's order affirming approval of the hillside development permit. It challenges the order as "unlawful in substance," assigning error only to that "portion of LUBA's order that affirmed a local hearings official's determination that [SUB's] geotechnical reports conformed to applicable hillside development and site review standards." In particular, RBO argues that LUBA "misconstrued geotechnical report requirements," affirmed "inadequate findings" with respect to debris flows, landslides, and minimum variance from natural conditions, and affirmed findings with respect to slope movement that are "not based on substantial reasons and substantial evidence in the whole record."

RBO argues that the standard of review for "LUBA's evaluation of local code provisions" is to apply "the ordinary principles of statutory construction" as per *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). SUB counters that RBO "does not identify any issue with how LUBA construed the City's rules," but instead challenges the sufficiency of the evidence in the record by claiming that LUBA erred in affirming the local determination that the reports satisfied the report requirements. We agree that RBO's argument that the Foundation Engineering, Inc. (FEI) reports do not contain all the information required by SDC 3.3-530(A) is a challenge to the adequacy of the content of SUB's geotechnical reports and not to LUBA's interpretation of the city's rules regarding those reports.

It follows that our task under ORS 197.835(9)(a)(C) is to evaluate whether LUBA properly applied the substantial evidence standard. In doing so,

"we do not substitute our judgment for LUBA's on whether a reasonable person could make a finding of fact based upon the entire local government record. Instead, we evaluate whether LUBA properly stated and applied its own standard of review. If LUBA does not err in the articulation of its substantial evidence standard of review under ORS 197.835(9)(a)(C), we would reverse LUBA's decision only when there is no evidence to support the finding or if the evidence in the case is 'so at odds with LUBA's evaluation

that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review.'"

*Citizens for Responsibility v. Lane County*, 218 Or App 339, 345, 180 P3d 35 (2008) (quoting *Younger v. City of Portland*, 305 Or 346, 359, 752 P2d 262 (1988)).

The parties agree that the Hillside Development Overlay District requirements (SDC 3.3-500) apply here, because portions of the property proposed for the utility poles and power lines intended to connect the substation to an existing uphill power source exceed 15 percent in slope. SDC 3.3-510. SUB was, thus, required to submit certain reports, including a geotechnical report, along with its application for a hillside development permit, in order to "prevent or mitigate possible hazards to life and property and adverse impacts on the natural environment[.]" SDC 3.3-530. The geotechnical report must contain

"data regarding the geology of the site, the nature, distribution, and strength of existing soils, conclusions and recommendations for grading procedures, design criteria for corrective measures, and options and recommendations to maintain soil and slope stability and minimize erosion of the site to be developed in a manner imposing the minimum variance from the natural conditions. Where geologic conditions of the site indicate that a hazard may exist, the report shall show that the proposed Subdivision or Partition shall result in lots/parcels that are suitable for development. The investigation and report shall be prepared by a civil engineer/geologist or a geotechnical engineer."

SDC 3.3-530(A).

SUB submitted three geotechnical reports in the course of the hillside development application process:

1. The September 19, 2018, "Geotechnical Investigation and Seismic Hazard Study: SUB Glenwood Substation" prepared by FEI;

2. The December 27, 2018, "Slope Stability Review in Felling Areas" memorandum prepared by FEI; and

3. The July 24, 2019, " Geotechnical Investigation for Transmission Line Pole Structures" memorandum prepared by FEI.

RBO submitted its own reports written by licensed engineering geologist Gunnar Schlieder, Ph.D., of GeoScience, Inc.:

1. July 30, 2019, letter concerning "Slope Stability Concerns, SUB Power Line, Vicinity of E. 22nd Avenue"; and

2. August 6, 2019, letter concerning "Review of FEI 7/24/19 Submission, SUB Power Line, E. 22nd Avenue."

In the end, RBO's challenge to LUBA's order affirming the hillside development permit and SUB's response to that challenge amount to a battle between the experts regarding current and historic geologic features of the subject property, assessment of landslide, erosion, and seismic risks, and recommendations to maintain stability, mitigate erosion, and minimize impact. Assessing the credibility of the evidence—which includes resolving competing expert opinions—is up to the factfinder. *Root v. Klamath County*, 260 Or App 665, 671, 320 P3d 631 (2014); *Tigard Sand and Gravel, Inc. v. Clackamas County*, 151 Or App 16, 20, 949 P2d 1225 (1997), *rev den*, 327 Or 83 (1998). RBO's arguments concerning the weight to be given to the competing reports is beyond the scope of our review. LUBA's review was for substantial supporting evidence in the whole record.

LUBA's order reflects its understanding of the substantial evidence review that was its task to conduct. Specifically, LUBA concluded:

"[RBO] argues that the hearings official improperly construed applicable law and made a decision that is not supported by adequate findings or substantial evidence in concluding that SUB's geotechnical reports conformed to SDC 3.3-530(A). [RBO] argues that the hearings official's decision is not based on substantial evidence because, according to [RBO], SUB's geotechnical reports did not adequately respond to GeoScience's slope stability concerns or criticism that FEI's subsurface samples are not representative of actual soil conditions."

It then went on to say that

"[t]he hearings official found, and we agree, that FEI adequately responded to GeoScience's concerns. [RBO]

provides us no reason to second-guess the hearings official's decision to give more weight to SUB's geotechnical evaluation. We conclude that the hearings official did not misconstrue SDC 3.3-530(A) and the finding that SDC 3.3-530(A) is satisfied is supported by substantial evidence."

We infer that LUBA understood its role in reviewing for substantial evidence from its reference to the substantial evidence standard and its statement that it had "no reason to second-guess" the local hearings official's decision to "give more weight" to FEI's reports.

It is important to note that, in describing the hearings official's findings concerning slope stability and earth movement hazards, LUBA described the FEI reports, the various concerns raised by GeoScience about test locations and methods, and FEI's response to those concerns, all of which were in the record before the hearings official. To be sure, the engineering experts provided different views about soil stability, historic earth movement data, and risk assessments for the proposed utility pole installations and hillside development. But, as LUBA clearly understood, it was not LUBA's role to substitute its own judgment about the evidence for that of the hearings official. And we cannot say that the hearings official's findings were "so at odds" with the evidence in the entire record that we must "infer that LUBA misunderstood or misapplied its standard of review." *Root*, 260 Or App at 671.

We affirm on the sole assignment of error in RBO's petition for review.

## SUB'S PETITION

SUB seeks reversal of that portion of LUBA's final order that concludes that tax lot 101, the proposed site for the substation, contains a watercourse subject to water quality protection under SDC 4.3-115. SUB assigns error to LUBA's interpretation of the SDC 4.3-115 water quality rules, and it argues that LUBA's remand order is "unlawful in substance or procedure." ORS 197.850(9)(a). Specifically, SUB argues that LUBA "conflated" the city's definition of "watercourse" with the city's definition of "water quality limited watercourse" when LUBA found that "[w]etlands are specifically shown on the [Water Quality Limited Watercourse

(WQLW)] Map and protected by SDC 4.3-115." Further, SUB argues that LUBA was incorrect when it concluded that the planning commission "misconstrued" the SDC in finding otherwise. RBO, for its part, responds that LUBA "correctly determined that the waterside protection regulations prohibited development of an electrical substation" on tax lot 101.

SUB's challenge to LUBA's remand order depends on the correct construction of the SDC. We defer to the city's plausible interpretation of its own code when the interpretation in question was made by the city's governing body. *Hulme v. City of Eugene*, 299 Or App 76, 79 n 1, 448 P3d 705 (2019). But the question here is whether the Springfield Planning Commission and the Springfield Hearings Official, both subordinates of the city governing body, properly construed the city development code. Given that posture, "we apply our ordinary principles of statutory construction without any deference to the planning commission's, or LUBA's, construction of the" city code. *Simons Investment Properties, LLC v. City of Eugene*, 303 Or App 199, 205, 463 P3d 57 (2020). Thus, in reviewing whether LUBA's decision was "unlawful in substance," ORS 197.850(9)(a), we review the pertinent city code provisions to determine whether LUBA interpreted them consistently with the ordinary principles of statutory, or code, construction.

The parties appear to agree that the proposed substation site (tax lot 101) contains a "wetland." The city development code defines "wetlands":

> "**Wetlands.**  Areas inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances to support, a prevalence of hydrophilic vegetation typically adapted for life in saturated soil conditions. Wetlands include swamps, marshes, bogs, and similar areas excluding those constructed as water quality or quantity control facilities."

SDC 6.1-110 (boldface in original). SDC 6.1-110 also defines "watercourse" to include wetlands:

> "**Watercourse.** Rivers, streams, sloughs, drainages including intermittent stream and seeps, ponds, lakes, aquifers, wetlands and other waters of the State. This

definition also includes any channel in which a flow of water occurs, either continuously or intermittently, and if the latter with some degree of regularity. Watercourses may be either natural or artificial. Specific watercourses that are protected by this Code are those shown on the water quality Limited Watercourse Map."

SDC 6.1-110 (boldface in original). The question is whether the most restrictive water quality protection standards of SDC 4.3-115 apply to the proposed substation site or whether, instead, the natural resources standards of SDC 4.3-117 apply. LUBA concluded that SDC 4.3-115 applies. We construe the water quality and natural resources rules to determine if LUBA was correct.

We begin our navigation through the complex and interconnected provisions of the SDC where the parties and LUBA have focused their attention: SDC 4.3-115. That ordinance regulates development on lands containing, or adjacent to, certain water features. The parties agree that, if the most restrictive components of SDC 4.3-115 apply to tax lot 101, development of the substation would be prohibited. As pertinent here, section 4.3-115 applies "only to those sites that require *** approval as specified in Section 5.12-100." Section 5.12-125(E), the relevant ordinance within SDC 5.12-100, in turn, states that "[p]hysical features, including, but not limited to *** watercourses shown on the WQLW Map and their associated riparian areas; [and] other riparian areas and wetlands specified in Section 4.3-117 *** shall be protected as specified in this Code or in State or Federal law." SDC 4.3-115, thus, applies to (1) "watercourses shown on the WQLW map and their associated riparian areas" and (2) "other riparian areas and wetlands specified in Section 4.3-117."

The development setbacks and other natural resource protections found in section 4.3-117 apply to "[l]ocally significant protected wetlands, listed in the Springfield Local Wetland Inventory shown on the Local Wetland Inventory Map." Those protections do not apply to wetlands that the city does not designate as significant. SDC 4.3-117(B)(1)(b); SDC 4.3-117(B)(3)(b). And, RBO does not dispute that the city designated the wetland on tax lot 101 as "non-significant" in 2010. Because the wetland on tax

lot 101 is not a locally significant wetland, it is not one that section 4.3-117 designates for more stringent protections. The remaining question is whether the wetland on tax lot 101 is a "watercourse[] shown on the WQLW map."

The parties agree that tax lot 101 contains a wetland that, by definition, is a watercourse, as shown on the 2016 version of the WQLW map. However, SUB argues that the wetland's status as a watercourse does not mean that it is subject to the most stringent protections of SDC 4.3-115. We agree. LUBA concluded that subsections (A), (B), and (C) of SDC 4.3-115 each contain rules that apply to tax lot 101. However, the plain text of those provisions, considered in context, demonstrates that they do not, in fact, apply to tax lot 101. We address them one-by-one, as LUBA did.

First, SDC 4.3-115(A) protects "riparian areas along watercourses shown on the [WQLW] Map." It creates a series of rules regarding setbacks, relocation of watercourses, and other conservation requirements. LUBA concluded that, because the wetland on tax lot 101 was shown on the WQLW map,[6] SDC 4.3-115(A) applies to tax lot 101. That reading disregards the entire context of SDC 4.3-115(A).

SDC 4.3-115(A) reads:

"When addressing criterion E. (as specified in Sections 5.12-125 and 5.17-125) to protect riparian areas along watercourses shown on the [WQLW] Map, the following riparian area boundaries shall be utilized:

"1.   Along all watercourses shown on the WQLW Map with average annual stream flow greater than 1,000 cubic feet per second (CFS), the riparian area boundary shall be 75 feet landward from the top of the bank. Existing native vegetative ground cover and trees shall be preserved, conserved, and maintained between the ordinary low water line and the top of bank and 75 feet landward from the top of bank.

"* * * * *

"2.   Along all watercourses shown on the WQLW Map with average annual stream flow less than 1,000 CFS the riparian area boundary shall be 50 feet landward from the

---

[6] We discuss the WQLW map in more detail, below.

top of the bank. Existing native vegetative ground cover and trees shall be preserved, conserved, and maintained both between the ordinary low water line and the top of bank and 50 feet landward from the top of bank.

"* * * * *

"3.   Where a watercourse divides a lot/parcel and the existing riparian area along that watercourse is degraded in riparian function, the applicant may relocate the watercourse to another portion of the property as approved by the Public Works Director and applicable State or Federal agency.

"4.   If an expansion of the riparian area described in Subsections 4.3-115A.1. and 2. occurs as a result of a Federal or State agency permit process, the applicant shall:

"a.   Resubmit the preliminary Site Plan for additional review, as specified in Section 5.17-105;

"b.   Submit a Site Plan Modification application, as specified in Section 5.17-145; or

"c.   Resubmit the Tentative Plan for additional review as specified in Section 5.12-105."

Importantly, SDC 4.3-115(A) refers specifically to "*riparian areas along watercourses*" as specified on the WQLW map. (Emphasis added.) "Riparian area[s]" are defined in SDC 6.1-110 as "vegetated areas (generally consisting of trees, shrubs, and grasses) located along both sides of water bodies and are transitional boundaries between land and water environments. Riparian zones act as buffers to protect surface waters from contamination and are habitats for a large variety of animals and birds." The WQLW map displays water quality limited watercourses and their riparian areas (*i.e.*, rivers and streams with their associated vegetated areas). Subsection (A) clearly applies only to those bodies of water and their "riparian zones." It does not apply to all "watercourses." Paragraphs 1 and 2 refer only to the types of watercourses with certain strengths of stream flows. There is no indication that any of the "watercourses" referred to in subsection (A) are wetlands. LUBA misconstrued subsection (A) by concluding that "watercourses" referred to all watercourses on the WQLW map.

Next, LUBA focused on SDC 4.3-115(B)(9). That code provision states that "[r]epair, replacement or improvement of utility facilities" is permitted "as long as the riparian area is restored to its original condition." But, again, tax lot 101 is not located within a riparian area. It contains a wetland. Wetlands and riparian areas are distinct hydrological features, and the city code recognizes them as such. The code's restrictions on utility facilities within riparian areas therefore does not apply to tax lot 101, and LUBA was incorrect in concluding that it did.

Finally, LUBA discussed SDC 4.3-115(C)(1)(a). That code provision requires that developers "[a]void development" of [u]nsuitable areas," including "wetlands and riparian areas." And, because tax lot 101 contains a wetland, LUBA concluded that SUB must "avoid development" on that lot. LUBA misconstrued that provision, because it ignored its broader context within the city code. SDC 4.3-115(C) states that, "[f]or the protection of water quality and protection of riparian area functions as specified in Section 4.3-110, the following standards apply[.]" The code then lists a series of goals and regulations, including the one in paragraph (C)(1)(a) admonishing developers to avoid development of wetlands. But it makes clear that it applies only to "riparian area functions *as specified in Section 4.3-110.*" (Emphasis added.)

SDC 4.3-110 governs the city's stormwater management regulations. Its subsection (F) requires the creation of the WQLW map and assigns the public works director to "designate certain watercourses" to be included on the map. Those watercourses include ones that are "included by the State of Oregon Department of Environmental Quality (ODEQ) on its most recently adopted '303(d)' List of Impaired and Threatened Waterbodies," SDC 4.3-110(F)(1)(a), and watercourses "with significant water quality impairment identified by water quality monitoring and sampling done in accordance with approved quality assurance/quality control *** protocols," SDC 4.3-110(F)(1)(b). Section 4.3-110 also specifies that the WQLW map shall be adopted as a part of the city code, and that any revisions must be approved by the city council as amendments to the code.

Returning then to SDC 4.3-115(C)(1)(a), its provision requiring developers to "[a]void development" in wetlands refers only to those specified on the WQLW map or deemed "significant." The WQLW map was adopted as part of the city code in 2002 as part of ordinance 6021. However, the map adopted with, and as a part of, ordinance 6021, does not reflect that tax lot 101 contains a wetland or that it otherwise contains a watercourse. The parties' agreement on the presence of a wetland on tax lot 101 derives from a newer version of the WQLW map, which was published—but not formally adopted by city ordinance—in 2016. The 2016 map states that it was "reprinted with current base data," and it indicates that there is a wetland on tax lot 101. That indication, in turn, derives from the city's recognition, in 2010, that a "non-significant" wetland exists on tax lot 101. Thus, the 2016 map contains the base data from 2002, which was adopted by ordinance, and additional data, which was not adopted by ordinance. That additional data includes an indication that there is a wetland on tax lot 101. The fact that the wetland is shown on the 2016 map is not relevant for purposes of SDC 4.3-110—and therefore not relevant for purposes of SDC 4.3-115—because the wetland on tax lot 101 is neither "significant" nor is it identified or shown on the 2002 WQLW map adopted as part of city ordinance 6021. LUBA was therefore incorrect in determining that the wetland on tax lot 101 was a protected watercourse for purposes of the WQLW map.

The water quality protection standards of SDC 4.3-115(C)(1)(a) do not apply to the proposed substation site on tax lot 101. Instead, the natural resource protections of SDC 4.3-117 apply and, because the wetland on the site was designated by the city as nonsignificant, the required protections are through the federal and state permits SUB received for the site development.

LUBA's remand order based on its conclusion that "the planning commission improperly construed SDC 4.3-115 in approving the substation" is unlawful in substance.

Springfield Utility Board's motion to take judicial notice allowed in part, denied in part. LUBA order reversed and remanded on Springfield Utility Board's petition; affirmed on Royal Blue Organics' petition.